# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PRECISION PIPELINE, LLC, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 13-1823 |
| ) | |
| v. ) | Judge Cathy Bissoon |
| ) | |
| TRICO SURVEYING AND ) | |
| MAPPING, INC., *et al.*, ) | |
| ) | |
| Defendants. ) | |

## ORDER

For the reasons that follow, Defendants' Motions for Summary Judgment (Docs. 102 & 109) will be granted.

The parties are well-acquainted with facts in this case and the law. Although the allegations in the Complaint originally were broader, Plaintiff now persists under a single legal theory against both Defendants: negligent misrepresentation, based on Defendants' failure to include subsurface crossings in the "Alignment Drawings" prepared for bidding-purposes in connection with the Dominion-project ultimately secured and completed by Plaintiff. *See generally* Pl.'s Br. (Doc. 114); *see also* Pl.'s Br. (Doc. 119) at 15 (confirming Plaintiff's abandonment of independent claim(s) based on Defendants' purported noncompliance with "One-Call" statute(s)). Agents of Dominion and Defendants have testified, uniformly and consistently, that it was not their intention that <u>all</u> underground crossings would be identified; rather, Defendants' identification of crossings was limited to above-ground crossings and underground crossings evinced by above-ground markers. *See* Trico's Br. (Doc. 103) at 5

(citing record evidence).[1] Nevertheless, Plaintiff contends that Trico and Dominion's written "scope of work" was not so limited,[2] and for the purposes of summary judgment, Plaintiff may enjoy a favorable presumption regarding potential contractual ambiguity. *See generally* DMP Ltd. P'ship v. Caribou Coffee Co., Inc., 2009 WL 2750257, *2 (W.D. Pa. Aug. 26, 2009) ("[a] contract is ambiguous if it is reasonably susceptible [to] different constructions and capable of being understood in more than one sense," and, ordinarily, "ambiguous [contract provisions] are interpreted by the finder of fact") (citations to quoted sources omitted). Although the Court believes that, based on the entire evidentiary record, Plaintiff *still* may succumb under the "no reasonable juror" standard, the Court need not go so far. This is true because the record confirms, time and again, *that Plaintiff had knowledge that Defendants' drawings did not depict all crossings Plaintiff was bound to encounter*.

Defendants' Motion-papers recount the numerous sworn statements of Plaintiff's agents confirming that, both during the bid process and shortly thereafter, Plaintiff was aware that Defendants' drawings did not depict all crossings. *See* Trico's Stmts. of Fact (Doc. 104) at ¶¶ 14-21. Particularly damning are the sworn statements of Jeff Taylor, a former employee of Plaintiff involved in the bid-preparation:

---

[1] Of the two Defendants, Plaintiff's case against Defendant G-A-I is more tenuous given the scope of that Defendant's responsibilities. *See generally* G-A-I's Stmt. of Facts (Doc. 111) at ¶¶ 6, 10 (G-A-I's duties were restricted to environmental compliance measures, and its controls were superimposed on Trico's drawings). Thus, the Court will focus on the facts relating to Trico, although, importantly, all of the Court's legal analyses and conclusions apply, with at least as much force, to G-A-I.

[2] *See* Doc. 117-1 at pg. 12 of 214 ("pertinent information" to be marked by Trico included "foreign crossings of the proposed pipeline route").

> When I reviewed the Alignment Sheets prior to submission of the bid, I knew that [Plaintiff] would encounter many more foreign line crossings than those that were depicted . . . because the location of the project was in an area that was very active in construction of gas transmission and production lines. I did not expect or anticipate that the Alignment Sheets depicted all sub-surface pipeline and utilities.

Aff. of J. Taylor (Doc. 108-1) at ¶ 7. These sentiments are echoed by a number of Plaintiff's other former and current employees, with the harmfulness to Plaintiff's case varying only in degree. *See* Doc. 104 at ¶¶ 16, 17, 18, 20 & 21 (summarizing record evidence).

Plaintiff's understanding was ratified, in conduct and writing, both during the bidding process and after. In a cover letter to its bid, Plaintiff singled out the issue as a "Recommendation[]" regarding "Risk Areas/Mitigation":

> For the most part these projects are standard for the region and as such, from a construction prospective, do not warrant discussion here. The only general comment we have is that <u>we suspect there may be some quantity of unknown pipelines to cross on these projects. This has been our experience in the recent past on similar type projects.</u> We do not feel these unknown [crossings] pose an unacceptable risk in terms of safety or our ability to install pipe as per our schedule. We propose that, should [Plaintiff] be the successful bidder, we negotiate a crossing price for unknown lines prior to the start of construction.

Doc. 107-1 at pg. 2 of 3 (emphasis added).

The sworn testimony of Plaintiff's agents confirms that, soon after construction commenced, Plaintiff began encountering a significant number of unmarked crossings. *See, e.g.*, Dep. Tr. of J. Holley (filed under Doc. 108-4) at tr. pgs. 70-71 (Plaintiff began encountering foreign crossings within two weeks of commencing construction); Dep. Tr. of R. Fischer (filed under Doc. 108-3) at tr. pgs. 103-104 (acknowledging that Plaintiff was "hitting a lot of unknown foreign crossings" shortly after late August 2011, and before meeting with Dominion in October 2011, in which concern was specifically addressed); Dep. Tr. of M. Pratt (filed under Doc. 107-3) at tr. pgs. 36-37 (in advance of October 2011 meeting, "[t]he number [of unmarked

3

crossings] was in far excess of what [Plaintiff] anticipated" based on "what was shown on the [drawings] at the time of bidding"); Dep. Tr. of S. Rooney (filed under Doc. 107-2) at tr. pgs. 15-16 (testimony of Plaintiff's president, confirming that it "began encountering foreign crossings almost immediately upon commencement," and it raised the issue with Dominion "almost immediately"). As alluded to in the above-quoted testimony, Plaintiff raised the issue with Dominion during a meeting in October 2011, and meeting minutes memorialize the discussion:

> [Plaintiff] would like to submit a unit lump sum price for all additional foreign line crossings <u>not shown on the construction [drawings] at the time of bid</u>. . . . Dominion instructed [Plaintiff] to submit this request and Dominion would take a look at it for consideration.

Doc. 108-5 (emphasis added).

On these facts, Defendants have leveled numerous arguments in support of summary judgment. The Court need not reach many of them, as the record clearly establishes that Plaintiff's claims are barred by the two-year statute of limitations; and Plaintiff cannot establish "justifiable reliance," as required under its negligent misrepresentation theory.

Before reaching those issues, though, the Court independently determines that, based on a review of the entire record, Plaintiff has failed to demonstrate that Defendants owed it a duty pursuant to *Bilt-Rite*. As Defendants aptly have observed, an application of *Bilt-Rite* under the circumstances would result in them owing a *greater* duty to Plaintiff than they did to Dominion. Although Plaintiff is correct that Defendants (and the Court) have not identified caselaw affirmatively stating that such a result is problematical, the Court believes that the teachings in *Bilt-Rite*, more generally, counsel against a finding of duty.

In *Bilt-Rite*, the Supreme Court of Pennsylvania's decision to narrowly circumvent the contractual-privity requirement, and the prohibitions under the economic-loss-doctrine,

4

was premised on the understanding that its adoption of Section 552 "would not supplant the common law[,] . . . but rather . . . would serve to clarify the elements of the tort as they apply to those in the business of supplying information to others for pecuniary gain." *Id.*, 866 A.2d 270, 280 (Pa. 2005) (emphasis added). Under the common law, the existence of duty is a legal question, requiring a weighing of several discrete factors, including: (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution. *Id.* at 281 (citation to quoted source omitted).

The Court agrees with Plaintiff, as it did at the 12(b)(6) stage, that Plaintiff's claims, on the surface, appear to fall within the category envisioned under *Bilt-Rite*. But a closer examination of the duty-factors, now that all of the facts from discovery are in, counsels against a finding of duty. Given the essentially-unrefuted evidence that neither Dominion nor Defendants understood or intended their contractual relationships to require the identification of all subsurface crossings, the foreseeability of Defendants' liability is significantly undermined. Furthermore, the consequences of imposing such a duty on Defendants would be troublesome, given that an obligation to fully investigate subsurface crossings, under the circumstances, may or would have warranted a *significant* increase in remuneration to justify Defendants' assumption of the risk (or, conversely, a dearth of professionals willing to engage the endeavor). On the other side of the ledger, the sworn testimony of Plaintiff's own agents indicates its appreciation of the risk, and/or lack of reasonable expectation that all underground crossings would be depicted. Under the circumstances, a shifting of the risk from Plaintiff (or Dominion) to Defendants appears unwarranted, if not patently unfair. Walters v. UPMC Presbyterian

Shadyside, 2016 WL 4035668, *6 (Pa. Super. Jul. 21, 2016) ("Whether a duty exists is ultimately a question of fairness.") (citation to quoted source omitted); *accord* Prudential Ins. Co. of Amer. v. Goldman, Sachs & Co., 2013 WL 1431680, *9 (D. N.J. Apr. 9, 2013) (recognizing that such fairness relates to "both the party making the representation and to the party aggrieved by its dissemination").[3]

Even assuming Plaintiff could survive the duty-inquiry, summary judgment unquestionably remains warranted on the wholly-independent basis that Plaintiff's claims are time-barred under the applicable statute of limitations. The parties agree that the limitations period is two years, and this case was initiated on December 27, 2013. *See* Compl. (Doc. 1). Thus, Plaintiff's claims are untimely unless it can demonstrate that the statute was tolled until at least December 27, 2011.

As early as September 2011, and in no event later than October 19, 2011, Plaintiff was well aware of the operative facts, namely, that a significant number crossings existed that were not reflected on Defendants' drawings. *See* discussion *supra*. Realizing that it has to say something in response to its agents' numerous admissions, Plaintiff has devised a theory that it

---

[3] As relates to duty, and more generally, the opinions of Plaintiff's liability expert are inapposite. The expert has conceded that his opinions do not account for the operative-contract(s); nor does he accept or bind himself to Plaintiff's admissions-against-interest demonstrating foreseeability. Furthermore, although the duties that flow under *Bilt-Rite* are tort based, rather than contractual, the parties' contractual dealings can, and arguably must, be considered as part of the circumstances and relationships between the parties. Roche v. Ugly Duckling Car Sales, Inc., 879 A.2d 785, 790 (Pa. Super. 2005) (duty inquiry examines foreseeability under "the circumstances of the case," and involves "[a] weighing of the relationship of the parties") (citations to quoted and other sources omitted); *see also* Gongloff Contracting, L.L.C. v. L. Robert Kimball & Assocs., Architects & Eng'rs, Inc., 119 A.3d 1070, 1077 (Pa. Super. 2015) (*Bilt-Rite* allows recovery for negligent representations supplied "while performing" responsibilities "assumed or specifically made a part of [the] contract with the owner") (emphasis added). Finally, the Court believes, and therefore holds, that any putative ambiguity of contract (as referenced *supra*) is not dispositive of the duty determination, which is a question of law reserved for the Court.

did not discover until later a sufficiently high number of unidentified crossings to trigger its comprehension that the construction-approach it relied upon in bidding, "mainline construction," would prove too costly. *See* Pl.'s Opp'n Br. (Doc. 114) at 7-9. In support of this theory, Plaintiff's counsel highlights the testimony of some (though not all) of its agents that, based on history and/or experience, Plaintiff reasonably expected the number of unidentified crossings to be in the 5-15% range, as opposed to the significantly greater number actually encountered. *See id.* (citing record evidence). Unfortunately for Plaintiff, its theoretical attempt at "splitting the baby" bears little relation to governing law.

In Pennsylvania, the standard of reasonable diligence applied under the discovery rule "is objective, not subjective. <u>It is not a standard of reasonable diligence unique to a particular plaintiff</u>, but instead, a standard of reasonable diligence as applied to a reasonable person." Dalrymple v. Brown, 701 A.2d 164, 167 (Pa. 1997) (emphasis added). The rule is strict, and it has been applied "harsh[ly]" to plaintiffs appearing far more sympathetic. *See, e.g., id.* (refusing to extend rule into realm of subjectiveness, even for plaintiff alleging that psychic damage from child-abuse prevented earlier discovery of harm). Courts here, and in other jurisdictions bound by materially analogous standards, have rejected the "unique to me"-type argument presented by Plaintiff. *See, e.g.*, Ingros v. BFG Electroplating & Mfg. Co., 81 Pa. D. & C.4th 481, 488-89 (Pa. Com. Pl. 2006) (rejecting, as a matter of law, plaintiffs' "subjective feeling that they did not possess enough information to sue . . . until hearing that [defendant] was 'most likely' the cause of the contamination" in question); Gagliardi v. Flack, 446 N.W.2d 858, 861-64 (Mich. App. 1989) (rejecting argument that limitations period should be tolled until injury, known and obvious to plaintiff, reached sufficient level of seriousness to exceed statutory-threshold for recovery).

7

While the Court could cite *ad nauseam* permutations of the governing legal standards and illustrative case-holdings, to do so would only belabor an already-obvious point. Plaintiff's operative agents repeatedly confirmed that it had actual knowledge of the alleged-harm by no later than September/October 2011. Although some (though not all) of its decision-makers claim to have anticipated a smaller percentage of unknown crossings, this purported distinction is insufficient under Pennsylvania law.

Even less grounded are Plaintiff's suggestions that tolling should be tied to Dominion's subsequent refusal to negotiate acceptable payment-adjustments regarding unknown crossings; or that Plaintiff did not uncover the pertinent details until after having taken discovery in this case. *See* Pl.'s Opp'n Br. (Doc. 114) at 9-10. Unsurprisingly, Plaintiff cites no legal authority in support of these positions, and they are facially inconsistent with governing law. *See* discussion *supra*; *see also* <u>Ingros</u> at 488-89 (acceptance of analogous theory would contravene a central purpose of limitations periods, namely, providing repose). The Court also notes that, were Plaintiff's case-discovery argument read too literally, it might well raise eyebrows under Federal Rule 11. *Compare* Fed. R. Civ. P. 11(b)(3) (in submitting pleadings, signatory represents that "<u>the factual contentions have evidentiary support</u> or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery") (emphasis added) *with* Am. Compl. (Doc. 14) at ¶¶ 66, 78 (alleging, without qualification on "information and belief," that Defendants prepared drawings containing negligent misrepresentation(s), thereby harming Plaintiff).[4]

---

[4] To be sure, the paragraphs cited above can be read to incorporate-by-reference other averments stated on information and belief. *See id.* at ¶ 64. But even conditioned on information and belief, Plaintiff's averments beg the question: how can it claim to have lacked sufficient understanding of the harm, while at the same time knowing enough to commence this lawsuit against these Defendants? The Court asks these questions not to suggest that Plaintiff or its

8

Finally, Defendants are entitled to summary judgment for Plaintiff's failure, as a matter of law, to establish justifiable reliance. Although the controlling standards arguably may be more forgiving than those regarding the statute of limitations, the result is no different. The purported "falsity" of Defendants' representations, *i.e.*, its negligent provision of incompletely-marked drawings, was known to Plaintiff, both before its bid was accepted and shortly after construction commenced. *See* discussions *supra*. A recipient is not "justified in relying upon the truth of an allegedly fraudulent misrepresentation if [it] knows [the statement] to be false or if [the] falsity is obvious." Toy v. Metro. Life Ins. Co., 928 A.2d 186, 207 (Pa. 2007) (citation omitted). To the extent Plaintiff relied, its reliance was unjustified.

For all of the reasons stated above, Defendants' Motions for Summary Judgment (**Docs. 102 & 109**) are **GRANTED**. A judgment order pursuant to Federal Rule of Civil Procedure 58 will follow.

IT IS SO ORDERED.


September 28, 2016                                    s\Cathy Bissoon
                                                     Cathy Bissoon
                                                     United States District Judge
cc (via ECF email notification):

All Counsel of Record

---

counsel have run afoul of Rule 11, but merely to highlight the logical inconsistency (and degree of desperation reflected) in its stated position.